JEFFREY WOLLERMAN,

        Plaintiff,                                Case No.: _____

      v.

EWALT WOLLERMAN

    – and –

JOAN WOLLERMAN,
*As Guardian Of Ewalt*

        Defendants.

---

## COMPLAINT

---

NOW COMES the Plaintiff, Jeffrey Wollerman ("Jeffrey"), by and through his attorneys, Barton Cerjak S.C., and for his Complaint against Defendants, Ewalt Wollerman ("Ewalt") and Joan Wollerman ("Joan"), in her capacity as guardian of Ewalt who was operating as his power of attorney prior to the implementation of the guardianship (collectively, "Defendants"), alleges and states as follows:

<u>OVERVIEW</u>

1. Defendants did not file the underlying defamation lawsuit (the "Defamation Action," discussed *infra*) to protect Ewalt's reputation. They filed it to weaponize the courts. Indeed, this abuse of process case arises from Defendants' calculated effort to misuse the judicial process to retaliate against Jeffrey after one of his children disclosed that the child had been sexually abused for years by Ewalt, Jeffrey's father and the child's grandfather. When those allegations prompted a multi-state investigation by law enforcement and ultimately led to felony criminal charges, Defendants responded not by confronting the evidence or seeking accountability, but by launching

a meritless defamation action against Jeffrey—Ewalt's own son—to silence him and gain leverage in the criminal and civil proceedings stemming from the abuse.

2. The Defamation Action was baseless from the moment it was filed. The statements on which Defendants based the Defamation Action were true, and Defendants knew it. The lawsuit therefore served a different purpose altogether; namely, to punish Jeffrey for advocating on behalf of his child, to intimidate witnesses and family members who might testify, and to undermine the criminal prosecution and related civil litigation arising from Ewalt's depraved actions. Defendants' actions after filing the Defamation Action confirmed as much. Rather than pursue the claims they brought, Defendants obstructed discovery, refused to meaningfully prosecute the case, and ultimately abandoned the lawsuit entirely—dismissing it with prejudice only after Jeffrey incurred significant damages exposing the fundamental flaws in Defendants' case.

3. Defendants' conduct was not merely aggressive litigation. It was a deliberate abuse of the judicial process. By initiating and maintaining a knowingly meritless lawsuit to gain a collateral advantage in other proceedings and to retaliate against Jeffrey for standing up for his child, Defendants engaged in precisely the kind of misuse of legal process that Wisconsin law forbids. Jeffrey now brings this action to hold Defendants accountable for that misconduct and to recover the damages to which he is entitled under the law.

### PARTIES

4. Plaintiff, Jeffrey Wollerman, is an adult citizen of the state of Minnesota.

5. Defendant, Ewalt Wollerman, is an adult citizen of the state of Wisconsin.

6. Ewalt is Jeffrey's biological father and the paternal grandfather to Jeffrey's children, including Victim One ("V1"), whose name is omitted for confidentiality reasons.

2

7. As detailed herein, on or about July 10, 2025, Ewalt was declared incompetent to stand trial in the matter styled as *State of Wisconsin v. Ewalt C. Wollerman*, Winnebago County Case No. 2024–CF–000629 (the "Felony Action") pursuant to Wis. Stat. § 971.14; a criminal case in which Ewalt was charged under Wis. Stat. § 948.025(1)(e) (Repeated Sexual Assault of the Same Child) for molesting V1, when V1 was between the ages of four and ten years' old.

8. Defendant, Joan Wollerman, is an adult citizen of the state of Wisconsin.

9. Joan is Ewalt's wife, Jeffrey's biological mother, and the paternal grandmother to Jeffrey's children, including V1.

10. On information and belief, for the past several years, Joan has exercised supervision and control over Ewalt's affairs pursuant to a power of attorney.

11. On or about March 3, 2026, Joan was appointed as Ewalt's guardian pursuant to a Wis. Stat. §§ 55.001 *et seq.* guardianship proceeding, which was ordered by the Felony Court (defined *infra*) following its July 2025 determination that Ewalt lacked competency to stand trial for sexually abusing Jeffrey's child, V1, which formed the basis of the State's criminal complaint in the Felony Action.

### JURISDICTION AND VENUE

12. This Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1332(a)(1) & (c)(2) because Jeffrey is a citizen of Minnesota; Joan and Ewalt are citizens of Wisconsin; and the matter in controversy exceeds $75,000, exclusive of interest and costs.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) & (b)(2) because this is the judicial district in which both Defendants reside and a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

### *Jeffrey Learns That V1 Was Sexually Abused By Ewalt As A Child, Which Prompts A Multi-State Investigation*

14. In or around November 2021, Jeffrey's child, V1, told a therapist that Ewalt molested VI on multiple occasions over several years, starting when V1 was about four years old.

15. V1's revelation triggered VI's therapist's mandatory reporting obligations to inform law enforcement and V1's parents about the abuse V1 was forced to endure.

16. A multi-state investigation ensued given the locations where V1 stated the abuse occurred, in which law enforcement from Winnebago County, Wisconsin (where Defendants maintain their primary residence), Hennepin County, Minnesota (where V1 maintained her primary residence when the abuse occurred), Crow Wing County (where V1 had a family cabin), and Marion County, Florida (where Defendants have historically spent the winter months) investigated V1's allegations.

17. Throughout 2022, Jeffrey and his wife actively assisted law enforcement to gather information regarding the abuse allegations and as the investigation unfolded, remarkably similar allegations levied against Ewalt resurfaced.

18. Specifically, in 1997, one of Ewalt's other grandchildren claimed that "Grandpa Wally" repeatedly molested that grandchild, which began when the grandchild was approximately 3.5 years old (approximately the same age as V1 when Ewalt began the abuse).

19. In February 2023, V1 summoned the strength to make a statement and pursue the investigation further, which prompted Jeff and his wife to contact the Neenah Police Department ("NPD") regarding next steps.

20. V1 met with the NPD on or about February 24, 2023 to sit for a forensic interview

4

and assist in the investigation.

21.     On information and belief, through the course of the NPD's investigation in the Spring of 2023, it learned that Defendants were residing at their winter home in Florida, which prompted the NPD to contact the Marion County Sheriff's Office ("MCSO") for assistance with the investigation.

22.     In late April 2023, Officer Batts from the MCSO was assigned to the investigation and contacted the NPD for its investigative file.

23.     On May 10, 2023, Officer Batts proceeded to interview Defendants in Florida.

24.     When Ewalt was confronted regarding the allegations that he sexually abused V1, he informed Officer Batts that he had no recollection of whether or not he ever abused V1.

25.     Officer Batts then questioned Ewalt regarding his interaction with V1 in Florida and—in a Freudian Slip—Ewalt stated that he knew "*for sure that nothing occurred in Florida, and that if it did happen, it would have happened in Minnesota*[1] *or Wisconsin.*"

26.     During that interview, Officer Batts also privately interviewed Joan in which she acknowledged that she was aware of V1's allegations because Jeffrey confronted Joan about them approximately a year prior to Officer Batts' interview.

27.     When Officer Batts inquired into the veracity of the abuse allegations, Joan candidly admitted that she "*believes [V1] is telling the truth.*"

28.     Although Joan did not know where the abuse occurred, Joan reiterated to Officer Batts that V1 "*would not lie*" and further confronted Ewalt about the allegations once they came to light, in which she "*made it clear to Ewalt that she believes the allegations are true.*"

---

[1] As noted above, Jeffrey is a citizen of Minnesota, where is primary residence is located, which is also where V1 grew up when the abuse occurred.

29. Officer Batts' field notes from the interview also described Joan's demeanor as follows: "*Joan seemed genuinely mad at Ewalt and made comments such as she wanted to rip his head off and that she cannot even look at him.*"

30. Although Officer Batts' interview helped corroborate V1's allegations, the MSCO ultimately deferred to the NPD to take the lead on the investigation. Thus, the MSCO closed its investigation and Officer Batts' interview recordings and field notes were sent to the NPD in furtherance of its investigation.

31. On June 15, 2023, V1's mother—in coordination with the NPD—confronted Ewalt regarding his abuse of V1 after the NPD equipped V1's mother with a recording device.

32. During this encounter, Ewalt expressed that he was sorry for what he did; that he was the problem; and that while he could not recall specifics about the abuse itself, he was not sure how old V1 was when the abuse occurred.

33. When Ewalt was pressed further about V1's age and the pervasiveness of the abuse, Ewalt stated "*I thought I only did it once, if I did it at all.*"

34. The conversation between Ewalt and V1's mother also touched upon other sexual abuse allegations that were levied against Ewalt in prior years by other family members, including the 1997 Incident.

35. Although Ewalt was never charged in connection with the 1997 Incident, Jeff's wife confronted Ewalt regarding these allegations and specifically pressed Ewalt as to whether everyone who had accused him of abuse was lying.

36. In response, Ewalt stated that "*I believe I probably did all everything they said but I don't remember know. I don't remember.*"

37.     Later in the conversation, Ewalt reiterated that he "*had to have*" committed the abuse because "*kids don't lie,*" but that he didn't recall any specifics about his abuse of these victims because he must have "*blocked it out of [his] mind.*"

38.     Accordingly, at the close of its investigation in August 2023, the NPD recommended to the Winnebago County District Attorneys' Office (the "DA's Office") that Ewalt should be criminally charged for sexually abusing V1.

### V1 Files The Battery Action Against Ewalt

39.     Throughout the multifaceted investigation into Ewalt's depraved conduct, Jeffrey was actively involved in the process, in which he worked closely with authorities; provided information and evidence to assist in the investigation; and staunchly advocated—like any parent would do in his position—for V1's rights to ensure that Ewalt was brought to justice.

40.     In connection with this process, Jeffrey met with the Winnebago County Assistant District Attorney, (the "ADA"), on or about February 6, 2024 to discuss whether the DA's Office was going to charge Ewalt in light of the NPD's recommendation.

41.     During that meeting, the ADA informed Jeffrey that Ewalt's criminal defense lawyer was also in contact with the DA's Office and furnished a doctor's note that ostensibly evidenced Ewalt's mental decline as a result of his Parkinson's Disease and a dementia diagnosis, which was complicating the ADA's decision regarding whether to charge Ewalt.

42.     As the DA's Office worked through these issues, V1 filed a civil suit against Ewalt on April 29, 2024, in the matter styled as *[V1] v. Ewalt Wollerman et al.*, Winnebago County Case No. 2024-CV-000407 (the "Battery Action").

43.     On June 25, 2024, Ewalt's civil counsel, Attorney Luke Fischer ("Attorney Fischer"), filed Ewalt's Answer and Affirmative Defenses to V1's Complaint in the Battery Action.

7

44. Contrary to the statements that Ewalt made in the underlying investigation, however, Ewalt's Answer in the Battery Action flatly denied that any abuse whatsoever occurred.

45. Ewalt's Answer did not raise his alleged lack of competency as a defense or issue that needed to be addressed in the Battery Action.

46. In fact, nothing in the Answer remotely suggests that Attorney Fischer's representation of Ewalt was impacted and/or being facilitated through Joan or another person, pursuant to a power of attorney or otherwise, given Ewalt's alleged competency issues.

47. Ultimately, however, the Battery Action was stayed following the State's ultimate decision to pursue criminal charges against Ewalt in August 2024.

48. On information and belief, Defendants were acutely aware that, given V1's age, V1 lacked the financial means to independently pursue civil charges against Ewalt and that VI's prosecution of the Battery Action—as well as VI's representation in the Felony Action to ensure VI's rights as a victim were honored—was being funded by Jeffrey.

### The State Files The Felony Action Against Ewalt, Prompting Him To Claim That He Lacked Competency To Stand Trial

49. After the Battery Action was filed, the Winnebago County District Attorney, Eric Sparr ("Sparr"), elected to pursue criminal charges against Ewalt.

50. Thus, on August 28, 2024, the DA's Office filed the Felony Action against Ewalt, charging him with First Degree Sexual Assault of a Child Under the Age of 13:

---

**CRIMINAL CHARGE**

**Count 1: 1ST DEGREE CHILD SEXUAL ASSAULT - CONTACT WITH A CHILD UNDER AGE 13**

The above-named defendant on or between 2008 through 2014, in the City of Neenah, Winnebago County, Wisconsin, did have sexual contact with a person who has not attained the age of thirteen, V1, DOB 05/06/2004, contrary to sec. 948.02(1)(e), 939.50(3)(b) Wis. Stats., a Class B Felony, and upon conviction may be sentenced to a term of imprisonment not to exceed sixty (60) years.

---

(*Felony Action*, Dkt. 2.)

51. At the outset of the case—and consistent with the pre-suit interactions with the DA's Office—Ewalt's criminal defense attorney, Amy Menzel ("Attorney Menzel"), reiterated concerns regarding Ewalt's alleged incompetency to stand trial on the criminal charges brought against him.

52. Accordingly, the court presiding over the Felony Action (the "Felony Court") ordered a competency examination pursuant to Wis. Stat. § 971.14, so it could determine whether Ewalt was competent to stand trial. (*See Felony Action*, Dkt. 18.)

53. The Felony Court's docket further reflects that an initial evaluation of Ewalt's competency (the "First Competency Report") was filed with the court on November 26, 2024.

54. On December 13, 2024, the Felony Court held a hearing to address various matters, including the findings set forth in the First Competency Report. Based on these findings in the report, the Felony Court ruled that Ewalt was competent to stand trial; a finding to which Ewalt's criminal defense attorney did not object.

55. A month later, at the January 15, 2025 preliminary hearing, the Felony Court concluded that based on the evidence and testimony presented, there was probable cause to believe that Ewalt sexually abused V1, as alleged in the criminal complaint.

56. At the close of the hearing, however, Attorney Menzel reiterated concern regarding Ewalt's alleged lack of competency, but did not request the Felony Court to reevaluate its prior decision at that time. (*See Felony Action*, Dkt. 29 (Tr. 35:8–23).)

57. Additional proceedings were held before the Felony Court on February 10, 2025, which prompted it to order a supplemental competency exam and set a hearing on March 10, 2025 to reevaluate Ewalt's competency. (*See id.*, Dkt. 35, ¶¶ 7–8.)

58. As of the March 10 hearing, however, the supplemental report was not finalized,

9

Case 1:26-cv-00475-WCG    Filed 03/24/26    Page 9 of 21    Document 1

which prompted the Felony Court to adjourn the hearing until it could receive the report and take testimony to better assess Ewalt's competency in compliance with Section 971.14.

59. Thereafter, Attorney Menzel informed the Court that she also retained a physician on behalf of Ewalt to assess his competency, and that she "expect[ed] to have the report completed by the end of April or early May." (*Id.*, Dkt. 43.) Thus, she requested that the competency hearing be adjourned until this report was completed, so the Felony Court could consider the reports and testimony from the State and Ewalt's respective experts. (*Id.*)

60. The Court obliged and set a competency hearing for May 10, 2025.

61. On May 8, 2025, two days before the competency hearing, Attorney Menzel filed her expert's competency report, which concluded that Ewalt was not competent to stand trial.

62. As a result, the DA's Office proposed obtaining a third expert to evaluate Ewalt and assist the Felony Court in determining whether Ewalt could be prosecuted for the heinous crimes with which he was charged. (*See Felony Action*, Dkt. 49.)

63. The Court accepted the proposal submitted by the DA's Office and rescheduled the competency hearing for July 10, 2025, so it could consider the reports and testimony from the State's initial expert, Ewalt's expert, and the third expert proposed by the DA's Office. (*See id.* Dkt. 52.)

64. At the July 10 competency hearing, the Felony Court heard testimony from the various experts and ultimately determined that Ewalt lacked the requisite capacity to be prosecuted in the Felony Action pursuant to Wis. Stat. §§ 971.13 & 971.14.

65. Accordingly, the Felony Court ordered that Ewalt be evaluated under Chapter 55 of the Wisconsin Statutes, to determine whether a guardian needed to be appointed over Ewalt.

66. On March 3, 2026, after multiple hearings, the Felony Court ordered that Ewalt be

placed in a guardianship and appointed Joan, Ewalt's wife, to serve in this capacity.

*The Defamation Action Is Filed To Gain A Collateral Advantage*
*In The Other Suits, But It Is Ultimately Dismissed On The Merits*

67. Despite declaring for many years that his lack of competency immunized him from prosecution in the Felony Action, on December 13, 2024—the *same* day the Felony Court initially declared him as competent to stand trial—Ewalt also filed a defamation suit against Jeffrey in the Winnebago County Circuit Court, where the Felony Action and Battery Action were also pending. *See Ewalt Wollerman v. Jeffrey Wollerman*, Winnebago County Case No. 2024-CV-001159 (the "Defamation Action").

68. The Complaint in the Defamation Action was filed by Attorney Fischer, the same lawyer representing Ewalt in the Battery Action.

69. Despite Ewalt's simultaneous contentions that he lacked capacity to face criminal prosecution, however, the complaint reflects that Attorney Fischer filed the Defamation Action *directly* on behalf of Ewalt—*not* through a representative like a power of attorney or guardian.

70. On information and belief, however, the Defamation Action was also being coordinated and directed by Joan in her capacity as Wally's power of attorney, and who readily acknowledged the shame and disrepute the Felony and Battery Actions would have on Defendants' image and standing with friends and family.

71. The gravamen of the Defamation Complaint alleges that: (a) on December 16, 2021, Jeffrey contacted Christopher and Susan Berberet (the "Berberets") to tell them that Ewalt sexually abused V1, and that the Berberets should check with their children to confirm that Ewalt did not do the same thing to their children; (b) Jeffrey reiterated the same sexual abuse allegations to Chris Berberet on two occasions in the Spring of 2022 and June 2022; and (c) sometime between

November of 2022 and March of 2023, Jeffrey also informed Ewalt's extended family, including Ted and Debra Jung as well Rick and Katie Buss, that Ewalt sexually abused V1. (*Defamation Action*, Dkt. 2, ¶¶ 6–12.)

72.     In stark contrast to Ewalt's repeated concessions that he could not recall the specifics regarding abusing V1, however, the Defamation Claims expressly declares that "*Ewalt at no time ever sexually abused Jeffrey Wollerman's [child].*" (*Id.*, Dkt. 2, ¶ 13.)

73.     The Defamation Action was filed without probable cause and for an ulterior purpose.

74.     For starters, Ewalt *did* sexually abuse V1, which he all but conceded and that Joan likewise acknowledged. Thus, any contention that Jeffrey "defamed" Ewalt by conveying to other family members that Ewalt sexually abused V1 is objectively frivolous because truth is a defense to any defamation action. *See Anderson v. Hebert*, 2011 WI App 56, ¶ 14, 332 Wis. 2d 432, 798 N.W.2d 275 ("Truth is an absolute defense to a defamation claim.").

75.     Yet even ignoring this egregiously fatal flaw to the Defamation Action, discovery readily established that Jeffrey never even spoke to Ted and Debra Jung or Rick and Katie Buss about Ewalt abusing V1, as each of these witnesses later confirmed via affidavit. (*Id.*, Dkt. 11 at 51–57.)

76.     In fact, each witness averred that not only had Jeffrey not contacted them, but that they were not even aware of any such allegations as the Defamation Complaint alleged. Each witness also explained that neither Attorney Fischer nor anyone acting on his behalf ever contacted them to inquire into the veracity of the statements alleged in the Defamation Complaint:

> 6.     That at no period of time was I ever contacted by Attorney Luke Fischer, or anyone acting on his behalf or his law firm's behalf with respect to the allegations made in the Complaint or even the fact that a Complaint was being prepared that included me as a material witness in support of the allegations raised in the Complaint.

(*Id.*)

77. As for the statements Jeffrey made to the Berberets, discovery revealed precisely why Jeffrey made them to Chris Berberet (his uncle) in the first place; namely, out of concern for the Berberets' adult children including Jeffrey's cousin/goddaughter—to ensure that she was not abused:

```
A    I think he was protecting his child.  I would
     have done the same thing in that situation.
Q    You don't think he was being malicious or
     mean-intended or ill-intended in any way, do
     you?
A    I don't know.  All I know is Jeff was angry,
     I don't blame him for being angry.  Sitting
     in his seat, I would have been angry as well.
Q    You don't believe he lied to you in any kind
     of respect, do you?
A    I don't believe he lied to me.  I think he
     believed everything he told me.
Q    And he didn't do it to hurt Wally, he did it
     to protect his daughter, correct?
A    That would be my assumption.
Q    In fact, he even went one step further than
     that.  He said, hey, maybe you should look
     at your own family, just make sure everything
     is okay, right?
A    Yes.
Q    So he was showing concern for your family.
A    Yes.
Q    And his goddaughter.
A    Yes.
Q    And what did you take of that?
A    It was a genuine concern.  I investigated it
     and answered the question.
Q    So there was nothing ill-motivated in your
     mind about that either.
A    No.
```

(*Id.* at 26–27.)

78. In other words, even ignoring that Jeffrey's statements to the Berberts were true, they were subject to a conditional privilege. *See, e.g.*, *Zinda v. Louisiana Pac. Corp.*, 149 Wis. 2d 913, 927,

13

440 N.W.2d 548 (1989) (stating its "agree[ment] with courts of other jurisdictions which have held that defamatory communications made to family members are ordinarily subject to a conditional privilege").

79.     Any competent pre-suit investigation would have revealed the Defamation Action was meritless, but Defendants filed it anyways.

80.     On information and belief, Defendants knew that the Defamation Action was meritless but proceeded to initiate this legal process anyways for an ulterior, improper purpose; namely, to gain a collateral advantage in the Battery and Felony Actions to retaliate against Jeffrey advocating for V1's pursuit of justice, including through his financial support of V1 in the Battery Action.

81.     On information and belief, Defendants also improperly initiated and maintained the Defamation Action to intimidate V1 from cooperating in the Felony Action and prosecuting the Battery Action. Indeed, Attorney Fischer forecasted Ewalt's intent to assert counterclaims against V1 in the Battery Action months prior, when the parties stipulated to stay that matter to allow the Felony Action to proceed:

> 3. Defendant explicitly reserves the right, and plaintiff agrees not to object to, filing a Counterclaim, within thirty (30) days of the date that the stay is lifted.

(*Battery Action*, Dkt. 13.)

82.     Defendants' gross misuse of the legal process for ulterior purposes is not only corroborated through the utter lack of merit to the claims alleged in the Defamation Action, but also through Defendants' obstruction of the discovery process and gross failure to prosecute the case.

83.     Indeed, following service of the Defamation Complaint, Jeffrey filed his Answer and

Affirmative Defenses—including the very defenses noted above—and requested the court presiding over the case (the "Defamation Court") to set an aggressive schedule to vindicate his rights. (*Defamation Action*, Dkt. 6.)

84. On January 21, 2025, Attorney Fischer responded and stated that the Defamation Court should proceed with this case on a "regular timeline," such that a trial would be held "near the end of this year or early next year." (*Id.*, Dkt. 8.)

85. On February 13, 2025—three days <u>after</u> Attorney Menzel, Ewalt's criminal defense attorney, requested his competency be reevaluated, (*Felony Action*, Dkt. 35)—the Defamation Court held a scheduling conference and entered its scheduling order in line with what Fischer proposed.

86. At no point during the parties' discussions regarding the appropriate schedule in the Defamation Action, however, did Attorney Fischer ever raise the ostensible need to preserve Ewalt's deposition testimony or how his client's alleged incompetency—simultaneously being bandied in the Felony Action—would impact the schedule in the Defamation Action.

87. And despite Fischer proposing a substantially similar schedule and agreeing to the Defamation Court's resultant order, Defendants immediately began parroting the same competency concerns as an ostensible justification for failing to participate in discovery and prosecute this case.

88. On March 13, 2025, for example, Jeffrey's initial counsel in the Defamation Action served an initial set of discovery requests on Ewalt and requested to take Ewalt's deposition.

89. Fischer refused to make Ewalt available, however, stating that he had "*serious concerns*" regarding the initial competency exam's findings and Ewalt's "*ability to comprehend questions being asked of him and to provide answers based on truthful recollections at this time.*"

90. Thereafter, Attorney Fischer moved to stay the Defamation Action until after the

15

Felony Action concluded, but withdrew that motion after Ewalt was deemed incompetent to stand trial in July 2025.

91.    Defendants' counsel then switched horses, and claimed on September 8, 2025, that consolidating the Defamation Action with the Battery Action "has _become_ appropriate" in light of the Felony Court's incompetency determination and that, even if consolidation was inappropriate, this competency determination necessitated relief from the scheduling order in the Defamation Action. (_Defamation Action_, Dkt. 33.)

92.    Specifically, Fischer claimed that consolidating the Defamation Action and granting an indefinite stay was needed because Ewalt "_is no longer able to testify given a finding in his criminal matter that he is incompetent and unlikely to regain competency_" and without Ewalt's ability to testify, Fischer must rely on other witnesses, including experts, to establish the falsity of the claims in the Defamation Action. (_Id._)

93.    In seeking this relief, however, Fischer elided reference to the fact that _he never believed his client was competent_, which served as his justification for refusing to produce Ewalt for a deposition in the Defamation Action as reflected in his March 31, 2025 correspondence:

> Dear Attorney Maurer,
>
> I have received your letter dated March 21, 2025 regarding my objection to Mr. Wollerman's deposition. First, I would like to point out that the objection is based on Mr. Wollerman's current condition. At the present time, I have serious concerns about Mr. Wollerman's ability to comprehend the questions asked and to provide truthful answers thereto. As such, I have a duty to raise these concerns. Additionally, I have an ethical obligation to zealously execute my duties as Mr. Wollerman's attorney, which includes engaging in discovery on his behalf.
>
> You suggested in your letter that Mr. Wollerman has been found competent following an evaluation in the criminal matter, but there are serious concerns regarding such evaluation. I have reviewed correspondence which strongly suggests that third parties, without any neurological or psychological training, sought to influence Mr. Wollerman's evaluator. Further, based on review of the results of the evaluation, I believe that the evaluator was influenced.
>
> That said, I have serious concerns regarding Mr. Wollerman's ability to comprehend questions being asked of him and to provide answers based on truthful recollections at this time. Given the nature of his condition, I must maintain my objection to his deposition based on his lack of competency.

94. In other words, even if indulges in the notion that Defendants had a good faith basis to file the Defamation Action in the first instance (they did not), their counsel's need for third parties and experts to successfully prosecute the defamation claims was *known when the case was filed.*

95. Even so, Defendants' legal team never retained, identified, or disclosed *any of these witnesses* by the June 30, 2025 deadline in the Defamation Court's scheduling order.

96. In fact, Defendants never took a single deposition in the Defamation Action throughout the entire year the case was pending while refusing to respond to multiple discovery requests in the very case Ewalt was ostensibly prosecuting.

97. All told, despite the Defamation Action pending for one year, Ewalt's legal team refused to furnish any interrogatory responses or produce any responsive documents; did not take a single deposition; failed to file any lay or expert witnesses list or produce expert reports by the June 30, 2025 deadline in the Defamation Court's Scheduling Order; and never sought affirmative relief from that Scheduling Order to extend or alter these deadlines despite ostensibly ongoing issues regarding Ewalt's alleged incompetency.

98. On November 5, 2025, Jeffrey substituted counsel.

99. After reviewing the file and getting up to speed, Jeffrey's new counsel filed his opposition to the motion to consolidate; moved to dismiss the Defamation Action given the gross failure to prosecute it; and served a sanctions motion pursuant to the twenty-one (21) day safe-harbor period.

100. In the face of these pending motions, and before the Court ruled on them, Ewalt dismissed the Defamation Action with prejudice and "on the merits," as reflected in the Court's resultant order:

STATE OF WISCONSIN  CIRCUIT COURT  WINNEBAGO COUNTY
BRANCH 6

_____

EWALT WOLLERMAN,

   Plaintiff,

v.              Case No. 24CV1159

JEFFREY WOLLERMAN,

   Defendant.

_____

### ORDER TO DISMISS
_____

  Based on Plaintiff's Motion to Dismiss the present action,

  IT IS HEREBY ORDERED that the above listed action is to be dismissed on the merits and without costs or further notice to the parties.

(*Defamation Action*, Dkt. 69.)

101. All told, Jeffrey incurred substantial damages, including to the significant attorneys' fees and litigation expenses he incurred to defend the Defamation Action, not to mention the panoply of other non-economic damages to which he is entitled under the law—including punitive damages—for the stress, anxiety, and humiliation of being subjected to such a gross abuse of process in which Defendants transparently engaged.

### COUNT I: ABUSE OF PROCESS
### (Against Both Defendants)

102. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

103. An abuse of process arises in situations where one "uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed." *Brownsell v. Klawitter*, 102 Wis. 2d 108, 114, 306 N.W.2d 41 (1981).

104. The intentional tort has two elements: (1) "a willful act in the use of process not proper in the regular conduct of the proceedings[;]" and (2) "an ulterior motive." *Id.* at 115. As the

18

Wisconsin Court of Appeals has explained, the "essence of this cause of action is the misuse of the court's power, 'usually to compel the victim to yield on some matter not involved in the suit.'" *Schmit v. Klumpyan*, 2003 WI App 107, ¶ 6, 264 Wis. 2d 414, 663 N.W.2d 331 (quoting Dan B. Dobbs, THE LAW OF TORTS, § 438 (2d ed. 2001)).

105.    Applied here, Ewalt filed the underlying Defamation Action against Jeffrey, which is a "legal process" under the law.

106.    On information and belief, and as detailed above, given Ewalt's alleged competency issues that his legal team repeatedly raised to avoid prosecution in the Felony Action and stymie discovery in the Defamation Action, Joan (Ewalt's power of attorney and now his guardian) was integrally involved in the decision to file and prosecute the Defamation Action.

107.    Further, the Defamation Action was filed without any semblance of probable cause. Setting aside that the Defamation Complaint alleged that Jeffrey published defamatory statements to various family members with whom he never even spoke, the fact remains that Defendants lacked a good faith basis to even assert a defamation claim—which presupposes the falsity of statements that harm a defamation plaintiff's reputation—when Ewalt *did, in fact, sexually abuse* V1.

108.    Further, there are no set of circumstances under which Jeffrey acted improperly or maliciously for conveying these statements to the Berberets (his aunt and uncle) out of concern for his own cousin and goddaughter, who Jeffrey feared may also have been one of Ewalt's victims.

109.    Thus, Defendants did not file the Defamation Action to ostensibly vindicate harm to Ewalt's "reputation." Rather, it was filed to gain a collateral advantage in the Felony and Battery Actions, as detailed above.

110.    Indeed, on information and belief, Joan was acutely concerned about how Ewalt's

19

sexual abuse of his own grandchild—while in Defendants' care no less—would impact her relationship with other friends and family members as well as bring disrepute to Defendants' standing within the community, which is why she told the NPD that "*she does not want to see this case go to court.*"

111. Thus, the Defamation Action further served as a mechanism—however legally baseless—for Defendants to deny that Ewalt committed such depraved acts, all while they were simultaneously seeking to have him declared incompetent to avoid prosecution in the Felony Action.

112. On information and belief, the Defamation Action also served as a vehicle to intimidate other potential witnesses with collateral civil litigation if they agreed to testify in the other pending matters or otherwise assist VI to vindicate VI's rights. After all, if Defendants would sue their own son for helping his child, they would not hesitate to sue other persons with similarly groundless defamation suits.

113. Further, as the foregoing facts of the underlying case detail, ample evidence exists that Defendants wantonly failed to prosecute the Defamation Action because they knew it was frivolous when it was filed.

114. In other words, Defendants initiated and maintained the Defamation Action for a wholly improper purpose, not to legitimately prove the falsity of the abuse allegations in the first place or otherwise vindicate the "harm" to Ewalt's "reputation" in which the panoply of his abuse would have been put on full display.

115. Accordingly, given their gross abuse of process, Defendants are jointly-and-severally liable to Jeffrey for their intentionally tortious conduct in an amount to be determined at trial.

<u>RELIEF SOUGHT</u>

**WHEREFORE,** Plaintiff respectfully requests the following relief, as allowed pursuant to

the above-referenced facts, the applicable caselaw, and the governing statutes:

(A) That the Court awards compensatory damages in an amount to which Plaintiff is entitled, including but not limited to the attorneys' fees that Plaintiff incurred in defending himself in the Defamation Action;

(B) That the Court awards punitive and/or exemplary damages in accordance with applicable law based on Defendants' malicious and intentionally tortious conduct;

(C) That the Court awards Plaintiff his and attorneys' fees incurred in connection with prosecuting this action; and

(D) That the Court award any other relief it deems just and equitable under the circumstances.

*PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE*

Dated this 24th day of March, 2026.

**BARTON CERJAK S.C.**

*/s/ Electronically Signed By James B. Barton*
James B. Barton
Email: *jbb@bartoncerjak.com*
Michael J. Cerjak
Email: *mjc@bartoncerjak.com*
313 North Plankinton Ave., Ste. 207
Milwaukee, WI 53203
T: (414) 877-0690
F: (414) 877-3039

*Counsel for Plaintiff, Jeffrey Wollerman*

21